**SOUTHWESTERN BELL TELEPHONE COMPANY, Relator,**

v.

**The Honorable Gary SANDERSON, Respondent.**

**No. 09–91–064 CV.**

Court of Appeals of Texas, Beaumont.

June 13, 1991.

Luecretia Dillard, Southwestern Bell, Houston, David Keltner, Haynes and Boone, Fort Worth, Walter J. Crawford, Jr., Wells, Peyton, Beard, Greenberg Hunt & Crawford, Beaumont, for relator.

Glen Morgan, Richard Clarkson, Reaud, Morgan & Quinn, Beaumont, for respondent.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BURGESS, Justice.

This is a writ of mandamus action. David and Barbara Miller (Millers) filed suit against Southwestern Bell Telephone Company (Southwestern Bell) and others to seek recovery for the death of their child. The Millers' vehicle left the road and flipped on its side. The child was thrown from the vehicle and the Millers allege he was decapitated by a guy wire attached to one of Southwestern Bell's telephone poles. Southwestern Bell alleges the automobile broke the guy wire and it was not involved in any injury to the child.

In early 1989, Southwestern Bell sent discovery requesting information regarding the Millers' experts. Specifically they were asked to list information regarding the identity, location and subject matter of testimony of each expert the Millers intended to call as witnesses. The Millers were also asked to produce "copies of all ... items of physical tangible evidence which will be relied on by your expert(s)...." On January 25, 1991, the Millers delivered to a co-defendant supplemental responses naming two additional expert witness, including Dr. Charles S. Petty, a pathologist. The supplemental answers included a preliminary report from Dr. Petty. This report indicated the child's body had been exhumed on January 16 and Dr. Petty had formulated some opinions based upon the examination of the exhumed remains. On January 28, Southwestern Bell filed a "Motion to Exclude Evidence Obtained in Unilateral Exhumation...." This motion stated, in pertinent part, "Such evidence should be excluded on the basis that its examination and reinterment without notice to Defendant and an opportunity for Defendant to attend violated an outstanding discovery request. The penalty for the Court to impose in such a situation is automatic exclusion of the evidence unless "good cause" is shown. (citation omitted) This has substantially deprived the Defendant of the opportunity to examine and have its experts view this piece of evidence prior to the Plaintiffs' alteration of the body. The time, administrative difficulties, and expense associated with a re-exhumation of the body as [sic] effectively put this piece of evidence out of the reach of Defendant and left Defendant with no adequate remedy outside the exclusion of the evidence." On February 1, Southwestern Bell filed a supplemental brief averring that the Millers had not only violated rule 166b(6), Texas Rules of Civil Procedure, but also rule 167(1)(g). That same day a hearing was held on Southwestern Bell's motion. At the conclusion of that hearing, the trial court ruled that the Millers should turn over the photographs obtained in the exhumation, as well as Dr. Petty's report two weeks prior to taking Dr. Petty's deposition. The court reserved ruling on the motion to exclude pending those matters. On February 22, Southwestern Bell filed a "Supplemental Motion to Exclude Evidence and for Additional Sanctions Under Rule 215...." On March 1, the court below denied Southwestern Bell's motions to prohibit the Millers "from opposing the fact that Chad Miller's decapitation and arm severance took place during the rollover sequence in the accident" and "precluding Plaintiffs' use of any evidence obtained or based upon the exhumation of Chad Mil-

ler's remains." The court also denied a motion for continuance, but did order "that Defendants are allowed to inspect Chad Miller's body." That same day, Southwestern Bell filed its motion for leave to file petition for writ of mandamus. This court, one justice dissenting, granted the motion for leave and stayed the trial court proceedings. TEX.R.APP.P. 121(c), (d). We now deny the petition for mandamus.

■ Southwestern Bell urges mandamus is appropriate. They seek to compel the trial judge to strike Dr. Petty as an expert and to prohibit the use of the physical evidence from Chad Miller's corpse. They argue that Dr. Petty, although designated more than 30 days before trial, was not designated "as soon as practical", TEX.R. CIV.P. 166b(6)(b), and the trial court abused his discretion in not striking Dr. Petty. They cite as authority *Builder's Equipment Co. v. Onion*, 713 S.W.2d 786 (Tex. App.—San Antonio 1986, orig. proceedings). However, in that case, the trial court did strike a witness who was designated 35 days before trial and the appeals court refused to issue the writ of mandamus holding that it was within a trial court's discretion to make a factual determination of the "as soon as practical" requirement and absent a clear abuse of discretion, mandamus would not issue.

■ This case, however, is not the granting of a motion to strike a witness, but the denial of same. In this instance, mandamus is not even available. A writ of mandamus is available to correct a clear abuse of discretion when there is no adequate remedy at law. *Jampole v. Touchy*, 673 S.W.2d 569 (Tex.1984). The trial court has merely refused to grant a pre-trial "suppression" motion. The witness may or may not be allowed to testify during the trial on the merits. This is not a discovery dispute involving either the obtaining or retaining of material. This is, in reality, an evidentiary objection that can and should be reurged at trial and then reviewed in the regular course of an appeal. Thus, we differ with the San Antonio court on the issue of the availability of mandamus. If, however, mandamus is available, we hold

the trial court did not abuse his discretion in refusing to strike Dr. Petty as an expert.

Southwestern Bell's reliance upon rule 167(1)(g) is simply misplaced. Subsection (g) must be read in conjunction with the entire rule. Rule 167 is entitled "DISCOVERY AND PRODUCTION OF DOCUMENTS AND THINGS FOR INSPECTION, COPYING OR PHOTOGRAPHING." Section (1) states: "Any party may serve on any other party a REQUEST: ...." Subsection (g) is clearly meant to protect items a party has produced pursuant to a request. This is not the case here. Even if there was any destruction or material alteration (this is a fact issue which was contested), it was not of any article produced by Southwestern Bell, thus Rule 167(1)(g) does not apply. Additionally our analysis of the previous complaint applies here. This is not a discovery issue. It is a pre-trial evidentiary ruling not subject to mandamus. The trial court may or may not admit the evidence during the trial. Once again, this evidentiary ruling will be subject to review on direct appeal.

The issuance of the writ of mandamus is denied.

**WRIT DENIED.**

WALKER, Chief Justice, concurring.

My original decision to grant Relator's Motion for Leave to File Writ of Mandamus was a result of my "tentative opinion that relator is entitled to the relief sought ..." TEX.R.APP.P. 121(c). That tentative opinion was based upon factual circumstance which mentally produced adjectives such as unfair, inappropriate, deceiving and the like. Upon thorough review, those adjectives linger still, however, mandamus is not the remedy.

The true question is whether relator shall ever have an adequate remedy other than exclusion of the evidence which is clearly for trial court determination. The real parties in interest have proposed that relator be allowed the opportunity to re-exhume "Chad's" body and make whatever test or examination relator deems fit. The body has been admittedly altered through

tests made by Dr. Petty. Certainly re-exhumation offers relator no present trial remedy nor fairness, but fairness is not the touchstone.

The opinion to which this concurrence is made suggests, "once again, this evidentiary ruling will be subject to review on direct appeal." That it shall, however, shall that be adequate?

BROOKSHIRE, Justice, dissenting.

With earnest respect, this dissent is filed. In this one-car accident wherein Chad's father was the driver of the automobile there were certain examinations, after an exhumation without notice, made on parts of the body of young Chad after the funeral and interment. Chad tragically died in the one-car accident. As I understand the record, there was not a complete autopsy as such, but there were several crucial parts or members of Chad's body that were exhumed out of the grave and out of the casket. These were examined and tested at some considerable length by one Charles S. Petty, M.D., of Dallas.

A major and strenuously contested issue in the case is by what manner and by what means was the head of Chad decapitated. Also a major disputed issue is how Chad's arm was injured.

The plaintiffs below set forth a theory that these severances and injuries were accomplished by a guy wire that was attached to a telephone pole owned by Southwestern Bell.

Dr. Petty did remove a major part (he said in his deposition) but not the entirety of Chad's cervical spine for the purposes of making certain, non-exhaustive tests for metal. As I read his lengthy deposition, he concluded that the guy wire was the means of the decapitation.

The exhumation of the body in the casket and the opening of the casket were accomplished in an "ex parte" fashion. No notice was given to the other parties to the litigation. The several parts of Chad's body were taken by Dr. Petty to Dallas for certain tests. Later these body parts were delivered by Dr. Petty to another Dallas physician. Some of the parties defendant took the position that the decapitation was accomplished by other means other than the guy wire. There was one position taken that the rolling-over of the car and a certain part of the automobile itself caused the decapitation.

When questioned, Dr. Petty responded in substance that he did not know whether Chad was still partially in the car or not, but that Petty was of the opinion that Chad was partially out of the car. He could not testify, at least at deposition time, that Chad was totally out of the car saying: "I can't tell you which it was." The doctor further stated that "[t]here was some question as to whether the car had somehow rolled over upon the child.... I said can one distinguish between the guy wire—striking the guy wire or the car or car—portion of the car rolling over on the child either all out or partially out of the vehicle. I'm sorry." The doctor testified further that to cause a decapitation that there would have to be something sharp connected with the vehicle, either perhaps the door being partially open or the edge of the door frame or something of that nature resulting in decapitation.

There was also a vigorously contested question as to how the injury to the arm of Chad occurred. The arm injury was a contested issue. The medical doctor, Petty, again testified, in substance, that from his past experience he had seen "arms locked [sic] off by guy wires" and that he had also seen many individuals who have been involved in automobile crashes where the cars have rolled and rolled onto them, causing similar results to arms. There were certain tests that the medical doctor did not perform, although available to him. He explained that because the body was quite moist and because of the time that had elapsed and because it had been altered by embalming that certain tests were not made. He explained that the body had been altered because the body had somehow or another been embalmed profusely and from the odor there was, in the doctor's opinion, a large amount of what he would term "cavity fluid" that had been apparently poured on the body *or* perhaps

introduced internally into the body and the washing off of those fluids would make a new determination for metals very difficult. The examining physician-pathologist repeated that there was a lot of embalming fluid and that so much of the embalming fluid had existed after the prolonged burial that the body was covered with this type of fluid. At one point he testified that the corpse floated in these liquids. He characterized the body as being covered with fluid and there was a great deal of fluid about the body; hence, he determined not to make certain tests.

Nevertheless, a part of the upper arm bone of Chad, being the humerus, was taken to Dallas and was tested in certain ways involving enzymes which changed to some degree the parts of the body of Chad that were examined by Dr. Petty. Perhaps a major thrust of Dr. Petty's deposition testimony can be fairly and basically summarized as follows:

Q Okay. But if somebody had done that, had taken the bones, put the enzyme on them to clean them up, and cleaned them up in the fashion that you've cleaned these bones up, it would be your opinion at that point that doing the metal test would be a waste of time?

A *Well, it's another complication. That's perfectly true.* (Emphasis added)

I think that the writ of mandamus should issue, at least conditionally. TEX.R.CIV.P. 167(1)(g) clearly, relevantly, and paramountly provides as follows:

Testing or examination shall not extend to destruction or material alteration of an article *without notice, hearing, and prior approval by the court.* (Emphasis added)

As I read the record before us, there has been some destruction of the evidence and there has been some material alteration of the articles of evidence. As the record now stands before us, I think the writ of mandamus ought to issue and ought to disallow Dr. Petty from testifying unless and until the other parties have a reasonably equal and equitable chance or opportunity, if such exists, to make similar relevant, authentic tests of reasonably equal probative value. This may or may not be possible at this time or in the future. I simply do not know from this record. Furthermore, as I interpret Rule 167, the request and response provisions simply, under this record, do not apply to Rule 167(1)(g). In any event, as I understand the record, there was no notice or hearing or prior approval by the trial court of the exhumation of Chad's body, the opening of the casket and the removal of the important, relevant, dispositive parts of Chad's body. Nor was there any prior notice or prior court approval of the tests made thereon.

Yet, there is a further reason why the writ of mandamus should issue, at least under this record and under the present circumstances which writ would disallow Petty's testimony before the jury.

TEX.R.CIV.P. 167a deals with physical and mental examinations. Rule 167a(a) provides in relevant part that when the physical condition of a person, either in custody or under the legal control of a party is in controversy, then the court in which the action is pending *may order that party to submit to certain examinations by a physician.* The rule further provides that the order may be made *only upon motion for good cause shown and upon notice to all parties and shall actually specify the time, place, manner and condition and scope of the examination and the person or persons by whom the examination is to be made.* As I read the present record, Rule 167a was not followed. It was violated. The plaintiffs below were, of course, in control of Chad's body and, indeed, they acted to the effect that they had and exercised legal control.

Yet the record does not reflect that they made a motion showing good cause for the examination by Dr. Petty, nor did they give notice to the other parties. Certainly the plaintiffs below did not specify by proper court order the time, place, manner, conditions and scope of the examination and the person or persons by whom it was to have been made to the other parties litigant. Hence, both in fairness and also because of

the above referenced rules and the relevant, controlling parts thereof, I think that the writ of mandamus should issue under the present record. The Texas Supreme Court rules of civil procedure are orders to the trial judge and the Courts of Appeals. Perhaps future events can correct some of the defects and violations of the above-quoted rules. The future cannot be predicted with accuracy by me.

Indeed, this Rule 167a even applies to examinations made by the agreements of the parties. This provision clearly proves the rule is to be strictly followed in utmost good faith. Rule 167a(b)(2). The only exception is if the agreement of the parties expressly provides otherwise. In reading and analyzing Rule 167(1)(g) it seems clear that there was some destruction of articles of evidence. Furthermore, there were material alterations. The phrase "material alteration", it seems to me, can be construed two different ways. One, the word "material" is a noun and that if any material was altered, then Rule 167(1)(g) compellingly applies. On the other hand, if "material" is to be construed as an adjective modifying the word "alteration" and "alteration" is looked upon as a noun, then I think, under this record, that there were some alterations of a material nature. Hence, either construction of the phrase "material alteration" would, in my opinion, bring into play fully the mandates of Rule 167(1)(g).

Dr. Petty testified that he did not "digest away" the skin of the remains of Chad's parts or members. He actually cut the skin away. This physician testified that Chad's remains were quite stiff because of the embalming. The physician also testified that he had cut from the shoulder joint down to the elbow joint of the left humerus. The humerus, he explained, is the arm bone. This bone was in three or four segments. The remainder of the left arm remained in the coffin.

The physician testified that he cut along the right side of the neck of Chad to get to the spine itself so that he could remove the majority part, although not all, of Chad's cervical spine. The cutting in this instance was along the right side of the neck. The record reflects that Dr. Petty was the only pathologist at the exhumation of the body which took place on or about January 16, 1991.

One of the attorneys for the plaintiff was also present along with one Craig Melancon who was connected with the funeral home. The parts of Chad's remains were taken to Dallas by Dr. Petty. Certain tests were performed in Dallas on the cervical spine and the humerus bones to test for pick-up traces of metal. Dr. Petty failed to make a number of available tests (at least three) which he could have performed with a dissecting microscope and certain x-ray tests and one test known as emission spectrography. The necessary, specialized, sophisticated equipment was in Dallas and available to Dr. Petty. These tests could have indicated whether there was metal involved that would cause the breaks in the bony structures and other parts and also what kinds of metal or metals were involved, such as galvanized metal, chrome metal or other types or kinds of metals or steel. The record reflects that Dr. Petty then turned over these parts of Chad's body to a Dr. King and these various parts were put in an enzyme, apparently by Dr. King also.

These enzymes have a tendency to and are capable of destroying or taking away tissue. These enzymes are capable of affecting and changing possibly or probably the bony structures, themselves. There is certainly some evidence in the record before us that the various pieces and articles of evidence dealt with by these two Dallas physicians has been changed or altered, if not, indeed, partially destroyed. Dr. King resides in Dallas or practices there.

It is clear that there are two different contended-for basic versions or actually two different scenarios in this case. One contended-for theory by some of the parties is that the car rolled upon to the boy and either injured or crushed his head in some manner or the car door opened and then slammed on him and crushed or severed his head. The other scenario is that the guy wire which was hooked on to a telephone pole severed Chad's head. Both

of these scenarios do involve metal; but the metals are of different types. Hence, it seems clear that the presence of metal or the non-presence of metal and what type of metal was present, if any, becomes of grave importance to the rights of all the parties and to the merits of this tragic case.

The writer wants to make it clear that the writer hereof does not impute to any of the protagonists, antagonists or actors in this case any untoward motives. The record reflects that, at least from some of the trial counselors, that three different options were suggested to the trial court. One was to exclude the plaintiffs' evidence obtained from Dr. Petty concerning the parts of the body. Of course, the other, or second option, was to allow Dr. Petty's testimony: that is, allow in evidence all of Dr. Petty's testimony or to totally exclude Dr. Petty's testimony. There was a third option discussed. It was said to be a reasonable or middle option.

That option was to have the court to order the reexhumation of the corpse and allow the defendants' experts to look at it and see if they can make meaningful, comparable, equal, equitable tests at this point in time. Future events can have a crucial and definitive effect on virtually all of these contested matters.

It is submitted that the case of *Jampole v. Touchy*, 673 S.W.2d 569 (Tex.1984), stands clearly for the proposition that discovery is meant to arrive at the ultimate, complete, whole truth. The trial court denied Southwestern Bell's motion to preclude the plaintiffs' use of any evidence obtained or based on the exhumation of Chad Miller's remains. Under the record as presently before us, I think that such ruling leads to an inequitable result and to an abuse of the judge's sound judicial discretion.

In my opinion, *if the case goes forward to trial under the present status of the case*, the City of Port Arthur and Southwestern Bell will not have a truly adequate remedy at law nor will they have an adequate remedy of appeal. The losing party or parties, in any event, can, of course, perfect an appeal, but under the record as it now stands as I view it, these parties cannot fully present their theory of the case and therefore they cannot show to the appellate court the errors they rely upon for a reversal of the judgment.

I respectfully disagree with the Court that Southwestern Bell's reliance on Tex.R. Civ.P. 167(1)(g) is simply misplaced. Here no notice or any type of request was even served on Southwestern Bell or the City of Port Arthur. No notice having been given, there was no hearing held by the trial court and no order was entered in accordance with the rules that gave notice of the exhumation and the somewhat selective testing of certain parts of Chad's body. I do not agree that the said subsection g of Rule 167(1) is meant to protect only those items a party has produced pursuant to a request. The Court's opinion concedes that the destruction of evidence and the material alteration of certain parts of Chad's body is contested. I submit some destruction of articles of evidence and material alterations have been shown.

*In Reality, Does Southwestern Bell Have an Adequate Remedy at Law by Way of an Adequate Appeal?*

Customarily, Texas appellate courts in the past have divided challenges to jury findings mainly into two or perhaps three groups. First is the "no evidence" point or "legal insufficient evidence" point. The second is the "insufficiency evidence" point. And the third is that the jury's verdict is so against the great weight and overwhelming preponderance of the evidence as to be clearly wrong and unjust. Recently there has been an excellent and scholarly article in the Texas Law Review of February, 1991, Volume 69, Number 3, page 515. This article was written by the Honorable William Powers, Jr., and Honorable Jack Ratliff. Professor Powers holds the Hines H. Baker and Thelma Kelley Baker Chair in Law at the University of Texas Law School. Professor Jack Ratliff holds the Robert W. Calvert Professorship of Law at the University of Texas Law School in Austin. These outstanding authorities in an excellently written article of

the highest scholarship, in my opinion, have divided the points of errors that attack or challenge jury findings into five fields or zones. The title of the article in the Texas Law Review is entitled *Another Look at "No Evidence" and "Insufficient Evidence".*

*Zone 1* deals with a situation where there is no evidence or no more than a mere "scintilla" of evidence that attempts to support a fact issue. Since there is no evidence, the litigant with the burden of proof on a particular issue is not entitled to have that issue or question even submitted to the jury. Such an attempted finding with no evidence to support it will be set aside upon proper appeal and in many cases, the appellate court can render judgment in favor of the opponent. Now, on this "no evidence" situation does Southwestern Bell have an adequate remedy by appeal? The answer is no. Upon a very careful and detailed and analytical reading of the deposition of Dr. Petty, a pathologist, there does exist some evidence—certainly more than a scintilla—if found by the jury, to support a jury finding that in this tragic case Chad's head was decapitated by the guy wire; and his left humerus was severely damaged by the guy wire. This conclusion is drawn, of course, as the record now stands before us, realizing that the exhumation and the examination of Chad's major parts of his cervical spine and humerus of his arm were done without notice to the other parties. The applicable rules of discovery cited herein were certainly not followed.

Concerning *Zone 2,* if there is some evidence of probative force—certainly more than a scintilla on an issue or question—then that issue or question must be submitted to the jury and if the jury finds in favor of the proponent of that issue; then, if there is any evidence of probative force or valuation to support the issue, an intermediate appellate court cannot and should not overturn the same. Here again, a careful reading of Dr. Petty's deposition, as the record now stands before us, raises some evidence of probative force and valuation backing up and supporting the plaintiffs' theory of the case concerning the decap-

itation and the very severe injuries and damages to the humerus. Hence, under Zone 2, Southwestern Bell has no adequate remedy at law by appeal. Nor is this the situation where there is some evidence to support the issue submitted, but there is not enough evidence of probative force to support a jury's finding in favor of the proponent of the issue. Under this standard of review, Southwestern Bell is dead in the water. This conclusion is valid because of the well-established and long-recognized rules that a jury may believe all of a witness' testimony or none of a witness' testimony or a jury may believe part of a witness' testimony and disbelieve other parts of the same witness' testimony. Indeed, decisional precedents clearly establish that the jury is the ultimate fact-finder and the ultimate weigher of the preponderance of the evidence when it comes to expert testimony. Again, Dr. Petty's lengthy deposition testimony would vitiate Southwestern Bell's appeal.

In *Zone 3,* (following the classifications made by Professor Powers and Professor Ratliff) there is enough, ample evidence to support a jury's verdict as advocated by the proponents against Southwestern Bell and, hence, a reviewing court would not be permitted or justified in making a contrary finding or setting aside the jury's germane findings. The intermediate appellate court is not a super jury. Under the constitutional law of Texas we cannot and should not disturb these findings of fact made by the jury. Under Zone 3, I respectfully submit Southwestern Bell, again, has no practical—certainly no adequate—remedy at law by appeal.

In *Zone 4,* the record and the evidence favoring the proponent's position on the issues submitted to the jury is even stronger and there exists ample evidence to support the jury's findings. The issues must go to the jury and a reviewing court cannot and must not set the jury's findings aside. There is one rare case and that case is when the reviewing court would be authorized to set aside a jury finding because the finding is against the great weight and overwhelming preponderance of the evi-

dence. Again, under this situation, I respectfully submit that Southwestern Bell is the loser, having no adequate or meaningful remedy at law by way of appeal.

*Zone 5* is not especially relevant here. In Zone 5, the proponent of the issue has introduced evidence that is so cogent, strong, and ultimately compelling that the proponent has proved a fact conclusively. That is, a fact has been proved "as a matter of law". In this Zone 5 situation, which is quite rare, a reviewing court can set aside a contrary finding and render judgment for the proponent. Briefly stated, as in and with Zone 1, when the state of the evidence and the record falls into Zone 5, there is really no issue of fact for the jury to decide. It becomes a "matter of law". However, under this record in view of the deposition testimony before us, Southwestern Bell cannot prevail under Zone 5. Indeed, Southwestern Bell cannot prevail under any of the zones; thus, Southwestern Bell has no realistic, practical, pragmatic, adequate remedy at law by way of an appeal. For this reason the writ of mandamus should be granted.

It must be stressed and emphasized that the other parties to the lawsuit other than the Millers have had no notice and have had no chance to perform similar and equal tests on the crucial parts of the corpse of the young boy.

If, however, the remaining parties to the lawsuit can have equal or nearly equal testing of the vital and crucial parts of Chad's body, maybe then, in that case, Dr. Petty's deposition might become admissible. However, the indications are at this time that truly equal or nearly equal testing may well be impossible.

I think that this is a discovery issue if discovery is to have meaning and completeness and discovery is to be a real search for the ultimate truth in a case. Only one side of the case has made discovery in crucial, paramount, determinative issues in the case; the other sides have not. And I must respectfully disagree that *under this record* a pretrial firm ruling is simply not subject to a writ of mandamus. This is a most unusual record. Several rules of civil procedure governing proper discovery have not been adhered to. See TEX.R.CIV.P. 166b, 167(1)(g) and 167a(a) as examples. The trial court has definitely indicated its rulings. Considering all the facts surrounding a lengthy trial and the applicable rules, Southwestern Bell and the City of Port Arthur do not have a complete, adequate, efficacious remedy by way of direct appeal.

This writer would argue and submit that this appellate court should declare its support for shared discovery. The concept of shared discovery is especially cogent and compelling in cases of exhumation, examination and testing of parts of the remains of a human being. Shared discovery, I think, becomes a necessity when the interment has lasted for a number of years. *See Garcia v. Peeples*, 734 S.W.2d 343 (Tex.1987). Since the Court does not declare its support for shared discovery in exhumation cases, such as this one, I must dissent.

This writer requests the Texas Supreme Court to consider a rule of discovery specifically setting out definite guidelines in exhumation cases. See the concurring opinion of Justice Burgess in *Lacy v. First National Bank of Livingston, Texas,* 809 S.W.2d 362 (Tex.App.—Beaumont, 1991).

Since the Court dismisses the writ, I must respectfully dissent. See this writer's dissent in *City of Port Arthur, Relator, vs. Honorable Gary Sanderson, et al, Respondents,* 810 S.W.2d 476 (Tex.App.—Beaumont, 1991). That dissenting opinion is incorporated fully into this dissent.